Robert Foy **MITCHELL**, Plaintiff,

v.

**ALMA SCHOOL DISTRICT NO. 30,**
Defendant.

Civ. A. No. FS–70–C–1983.

United States District Court,
W. D. Arkansas,
Fort Smith Division.

Oct. 4, 1971.

Daily, West, Core & Coffman by Ben Core, Fort Smith, Ark., for defendant.

Warren & Bullion by Eugene R. Warren, Little Rock, Ark., for plaintiff.

## MEMORANDUM OPINION

PAUL X. WILLIAMS, District Judge.

On October 5, 1970, the plaintiff Robert Foy Mitchell, filed complaint against Alma School District No. 30 alleging jurisdiction in the United States District Court under 28 U.S.C. § 1343 (3) and (4); 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. § 1983 and the 1st and 14th Amendments to the Constitution.

The complaint alleges that Mr. Mitchell was a school teacher in the Alma System, having taught for a period of 10 years; that he taught for the school year 1969–1970 under a written contract; that he was notified by a letter dated May 26, 1970 that Alma School District No. 30 would not renew his teaching contract for the next school year 1970–1971 because of his persistent failure to observe announced administrative policies regarding discipline of students and that such notice was vague and unconstitutional because he had a right to be employed under the Arkansas Statute 80–1304 (Act 84 of 1959) which requires re-employment if timely notice of termination is not given to a teacher.

The plaintiff, Mr. Mitchell, further alleges that termination of his employment was caused by his activity in trying to form a classroom teacher's organization and that such termination for such alleged reason was and is unconstitutional. He prays that this Court declare the "refusal to re-employ" a violation of his constitutional rights; that the defendant be ordered to re-instate and re-employ him; that the defendant be enjoined from refusing to employ teachers because of engaging in teacher association activities and for damages, attorney's fees and costs.

On October 23, 1970 the defendant filed a motion to dismiss the complaint and an answer denying the material allegations of the complaint, alleging that it gave proper notice to plaintiff of refusal to re-employ him and praying that the complaint be dismissed.

On October 29, 1970 the motion to dismiss was overruled by the Court.

At the trial before the Court on the merits the plaintiff appeared, testified in person and introduced witnesses. The officials and school board members of Alma School District No. 30 appeared, testified in person and introduced witnesses who testified.

In the main, the evidence given by all witnesses is true and uncontradicted, but with each side placing magnified importance on isolated circumstances that have assumed great importance in the mind of the particular witness.

From the viewpoint of the plaintiff the evidence reveals the following circumstances:

Prior to the school year 1969–1970 affiliated local organizations of the AEA (Arkansas Educational Association) had to be all inclusive. In the summer of 1969 the Constitution of the AEA was changed so as to permit local teachers to adopt one of six options. They could have county wide all inclusive local organizations or county wide separate organizations. They could have district all inclusive organizations or separate organizations. Even if the teachers adopt an "all inclusive" option they could form separate classroom teacher organizations which would be recognized by AEA. The AEA encouraged all local organization presidents to arrange for an immediate vote of the teachers. The plaintiff was on the Representative Assembly of AEA which adopted the option plan and was also President of the Crawford County Education Association, an all inclusive group. Mr. Mitchell attempted to secure the permission of Superintendent Dyer of the Alma School before the question was submitted to the teachers. He also sought the aid of the AEA which sent Hubert Blanchard and Ken Harrison of AEA to see Mr. Dyer personally and Mr. Dyer agreed to a vote on the "options". The option election was held in January 1970, and the Alma teachers voted for

option "A" which was a county wide all inclusive organization with provision for a separate classroom teacher organization.

After this vote Mr. Mitchell began working to get a vote of the Alma District School Teachers on a separate C.T.A. (Classroom Teachers Association). The then high school principal, Don Neathery, testified that Mr. Dyer said he was not going to permit a separate C.T.A. and would do everything he could to prevent one from being formed. Mr. Mitchell planned to admit the question of a separate organization of classroom teachers to the teachers at the Mountainburg meeting of April 20, 1970. He called a Mountainburg teacher, Mr. Brammer, two or three weeks prior to the time of the meeting, and asked Mr. Brammer to arrange for a separate meeting room in which to hold a meeting for the organization of a separate C.T.A. Mr. Brammer made such arrangements on April 6th. On April 13th Mr. Mitchell called Superintendent Dyer and asked if it would be all right for him as President of the C.C.E.A. to attend the Board Meeting to ask for an open door policy by the Board, which would permit representatives of the teachers to establish a discussion policy with the Board, which was and is an absolute essential to the formation and operation of a separate C.T.A. Mr. Mitchell testified that Superintendent Dyer refused to give permission for his attendance, telling Mitchell that he could not attend the meeting as a teacher. Mr. Mitchell then told him that he (Mitchell) would attend as a tax payer. Mr. Mitchell attended the meeting. Mr. Mitchell also testified that on the next day, April 14th, Superintendent Dyer called Mr. Mitchell and told him he was going to recommend to the Alma School Board that Mr. Mitchell not be given a contract for the following year.

Alma District teachers had attended the C.C.E.A. meeting immediately prior to Mountainburg meeting 100%. The meeting before that they had attended about 80%, but at the Mountainburg meeting only two teachers showed up. Mr. Neathery testified that Superintendent Dyer had called him and ordered him to go to the meeting to "see what Mitchell was up to" and to sabotage any attempt to form a separate C.T.A. When only two Alma teachers showed up no action was taken for the formation of a separate C.T.A.

Mr. Mitchell went to the May 11, 1970 meeting of the Alma School Board. He testified that he had been given no notice of termination, but he had heard that he was going to be terminated and Mr. Dyer had told him he was fired. Mr. Mitchell sat outside the meeting until he was called in and asked "what he had to say in his defense". He says he was not informed of the charges against him. On May 26th he was written a letter as follows:

Alma Public Schools
Office of Superintendent
Alma, Arkansas 72921
May 26, 1970

Mr. Robert F. Mitchell
Route 1
Rudy, Arkansas

Dear Mr. Mitchell.

This is to advise you that the Board of Education of Alma School District No. 30 will not renew your teaching contract for the next school year 1970–71.

You have requested by letter to know the reason for this action. In response to that request, you are advised that the reason for this action is your persistent failure to observe announced administrative policies regarding discipline of students.

Yours very truly,
Warren D. Blaylock
President, Board of Education
Alma School District No. 30.

The plaintiff contends that he was not re-employed because of his activity in the Teacher's organization and that the reason given in the letter notice was a sham.

Mr. Mitchell admits that he had some discussion with his supervisors concern-

ing discipline and sets out the following as an explanation: (From plaintiff's Trial Brief.)

"The first incident was related by Mr. Walter Leeper who was superintendent at Alma in 1966–67 and 1967–68. In 1966 Mitchell had paddled a girl student. There were no written or oral policies proscribing paddling of girls. Leeper called Mitchell in and told him not to paddle a girl but that he could paddle boys. Leeper re-employed Mitchell. The next year a girl named Zoe Teague had her foot and leg out in the aisle tripping boys. Mitchell took his paddle and gave her a slap on the leg to make her withdraw it. Mitchell contended that this was not a 'paddling' but Leeper thought it came within his prohibition. However, he did not discipline Mitchell but reemployed him, giving him another contract. In 1968 a group of pupils started a 'gang fight' while lining up to leave the room. Mitchell grabbed his paddle and broke it up. This incident was discussed with Mitchell by his principal and by the Superintendent. His teacher's contract was renewed thereafter. There was no written policy of the District respecting corporal punishment, but it appears that an oral announcement was made by the Superintendent that no paddling would be permitted except with another adult present. This was announced to be for the benefit of the teacher. Mitchell testified he did not hear the announcement. After this, only one incident occurred which was substantial. A pupil named Honea and another pupil whose name was not revealed engaged in a 'kicking match' both being seated in their regular seats and kicking each other across the aisle. Mitchell did take his paddle and break this contest up, striking both of them on their protruding legs so as to force them to desist the kicking. There was no formal paddling. Mitchell did not interpret this incident as administering corporal punishment but rather a necessary act to break up a fight. The Honea boy suffered a bruise on his leg. Whether it was caused by the lick from the paddle or a kick from his adversary combatant is not known. Mitchell, who had 9 years experience as a teacher in the district was recommended for re-employment by his principal. He was, however, not re-employed by the Board in a procedure heretofore set out." (From plaintiff's Trial Brief.)

From the viewpoint of the defendant, Alma School District No. 30, the evidence reveals the following:

The plaintiff, Mr. Mitchell, had been a grade school teacher in the Alma school for 10 years. He is an able teacher, more than well qualified; extremely interested in being a good teacher and improving the whole process of scholastic training. He has a dynamic personality, is a minister of a church, dedicated to his beliefs and willing to work. He has definite ideas about classroom discipline which some of us with school children would pay a premium to have used in the scholastic training of our children, but which unfortunately others of us with school children no longer choose to permit teachers to use in the process of scholastic training.

Mr. Mitchell's views of scholastic discipline and his strong personality led to a clash with his supervisors in the school system.

In December of 1967 the divergence of Mr. Mitchell's concept of corporal punishment in classrooms from that of his administrative superiors first evidenced itself when Mr. Walter J. Leeper was superintendent. Mr. Mitchell had punished Zoe Teague, by striking her with a paddle. The child was humiliated as well as punished and Mr. Leeper announced a policy in the Alma School System against the use of paddles on girls. The policy was not put in writing but it was made known to all of the teachers including Mr. Mitchell. Some of the teachers objected but, nevertheless, it was the announced administrative policy.

During the summer of 1968 there was a change of superintendents from Mr.

Walter J. Leeper to Mr. Charles Dyer. At the general faculty meeting in the fall of 1968 Mr. Dyer announced to all of the teachers that the policy on punishment was first to counsel with the child and attempt to obtain his cooperation without paddling; then if paddling became necessary that the teacher should always have an adult witness present. Mr. Francis Stewart, the school principal, followed up on this announcement by reducing the policy to writing and reading it in detail at a meeting of the elementary teachers that fall of 1968. Mr. Mitchell was present at the general faculty meeting and also at the meeting when the policy was read. Mr. Dyer repeated the announcement of his policy at a general faculty meeting in November 1968. Again he stressed the requirement of counseling with the child first and then stated that if indeed paddling was necessary, that it should not be done without an adult witness present. Mr. Mitchell was present for that meeting.

In spite of these announcements both Mr. Francis Stewart and Mr. Charles Dyer continued to get complaints from parents concerning the disciplinary practices of Mr. Mitchell. In October, 1968, Mr. Mitchell spanked Danny Honea too hard and had no adult witness. On December 19, 1968, Mr. Stewart counseled with Mr. Mitchell about his continued violations of the policy. Mr. Mitchell admitted having been told to have an adult witness present. The report of Mr. Stewart on this counseling is in evidence as an exhibit. It includes this:

> "I asked him if he hadn't been told to get an adult to witness each spanking that he administered. After some delay, he said that he remembered being told this in a faculty meeting about one month ago."

Also:

> "Mr. Mitchell requested that I make an appointment with Mr. Dyer and I told him that I would."

At the bottom of the report there is this notation in Mr. Dyer's handwriting:

> "Talked with Mr. Mitchell and he promised that he would never have another incident of this. I informed Mr. Mitchell that some type of action would have to be taken if this happened again."

Mr. Mitchell's contract was brought up separately and discussed at the March, 1969, meeting of the Alma School Board and there was sentiment on the school board at that time against renewing Mr. Mitchell's contract, but Mr. Dyer had received Mr. Mitchell's assurance that he was aware of the policy and would follow it and Mr. Dyer wanted to give him another chance.

In August, 1969, at the general faculty meeting, Mr. Dyer announced to all teachers the administrative policy concerning the disciplining of children. Mr. Mitchell was present.

Notwithstanding all of this Mr. Mitchell turned in reports showing paddlings without adult witnesses and there continued to be complaints from parents.

On March 24, 1970, Mr. Mitchell again violated the administrative policy by paddling Ricky Brammer without an adult witness present and the incident was not reported by Mr. Mitchell as required. When Mr. Stewart observed the child the next day he had a bruise on the calf of his leg.

Mr. Dyer testified that this was the straw that broke the camel's back; that it was obvious to him that Mr. Mitchell either did not intend to comply with the policy or was temperamentally incapable of complying.

It should be noted that while Mr. Mitchell testified to virtually complete ignorance of this policy, he acknowledged to Mr. Stewart that he had heard the announcement at a faculty meeting in November, 1968, and he turned in a number of written reports as required in the policy. If he did not know of the policy, it is strange that he would comply with it by turning in written reports. Further, his written reports listed adult witnesses as far back as January of 1969.

It is to be noted that the policy announced by Mr. Stewart recommended limiting a paddling to "two spats" and many of Mr. Mitchell's reports described "two spats."

The numerous reports which Mr. Mitchell turned in to his supervisor during the school year 1969–1970 reflect a clear knowledge of all of the elements in the announced administrative policy. When Mr. Stewart, the school principal, was requested to turn in his recommendations for the renewing of teacher contracts, he separated Mr. Mitchell and one other teacher from the general group of teachers and commented upon them separately. He recommended their re-employment but stated that each of them had done some things of which he did not approve.

Mr. Dyer requested Mr. Stewart to give him another report which would be more specific as to Mr. Mitchell. Mr. Stewart did this. The matter of renewing teachers' contracts was to come before the Board at the March 11 meeting.

Coincidentally, but just prior to the meeting, Mr. Mitchell advised Mr. Stewart that he intended to attend the Board meeting and Mr. Stewart told him that before he did so he had better contact Mr. Dyer. On the evening of the meeting and just prior to it, Mr. Mitchell called Mr. Dyer about attending the meeting. Mr. Dyer told Mr. Mitchell that the meeting was an open meeting and that he could not refuse anyone permission to attend but that if he had any matters relating to school administration it should be talked over with the administrative staff before being brought to the Board.

The testimony of the Board members establish that Mr. Mitchell appeared before the Board and talked in generalities concerning an "open door" policy which he hoped would be maintained by the Board and when asked by Board members if he thought they had ever had any other sort of policy, Mr. Mitchell assured them that he thought they were all very "fine and receptive gentlemen."

The matter of renewing Mr. Mitchell's contract came up and upon the recommendation of Mr. Dyer the contract of Mr. Mitchell was deferred until the April meeting because Mr. Dyer wanted to give Mr. Mitchell an opportunity to withdraw his request for renewal instead of being notified of a non-renewal.

When Mr. Mitchell did not withdraw his request for renewal Superintendent Dyer then made recommendation to the School Board that Mr. Mitchell not be renewed. Mr. Dyer recommended that the Board give Mr. Mitchell an opportunity to come before it and explain his version of all of the incidents which were cataloged and detailed in the principal's report. One of the members of the Board saw Mr. Mitchell sitting out in the hallway so he was promptly invited into the room. It developed, according to the testimony of Mr. Bolding, that Mr. Mitchell had already been furnished with details of the reports of the principal showing his violations of the announced administrative policies. The Board made efforts to discuss each one of them with Mr. Mitchell, and each such effort was met with a wide and general dissertation of a trip which Mr. Mitchell had made to the east coast and other unrelated activities. Mr. Basham testified that his decision (as a new member of the School Board) to vote for non-renewal was based as much upon Mr. Mitchell's performance before the Board, demonstrating his inability to discuss any point, stay on the point, clarify, articulate and reach conclusions, as anything else.

Following Mr. Mitchell's departure from the room the vote by the Board was unanimous that his contract not be renewed and that notice should be sent, which was done.

At no place in the Board's proceedings were any activities of Mr. Mitchell in any teachers organizations referred to. At no point did anyone remonstrate with him concerning such activities. At no point did anyone, Board member or staff, indicate the slightest interest in such activities. The interest and concern of the administrative staff and the Board in Mr. Mitchell concerned his compliance

and/or non-compliance with the announced administrative policies on disciplining students.

Giving due consideration to the evidence and the attitudes of both the plaintiff and defendant as to a proper conclusion to be drawn from the total circumstances in this case the Court finds:

1. The teachers contract between the plaintiff and defendant provides:

"(2) Time: The time period covered by the contract is 9 months of school: 180 days of school: 10 calendar months from 25 August 1969 to 29 May 1970."

In March, April and May, 1970 the applicable Arkansas Statute was Section 80–1304 (1969 Cumulative Supplement) which reads in pertinent part as follows:

"Every contract of employment hereafter made between a teacher and a board of school directors shall be renewed in writing on the same terms and for the same salary, unless increased or decreased by law, for the school year next succeeding the date of termination fixed therein, which renewal may be made by indorsement on the existing contract instrument; unless during the period of such contract or within ten (10) days after the termination of said school term, the teacher shall be notified by the school board in writing delivered in person or mailed to him or her at last and usual known address by registered mail that such contract will not be renewed for such succeeding year, * * *"

3. This statute was applied in Garner v. Highland School District, 243 Ark. 750, 421 S.W.2d 895 (1967), establishing that all that is necessary under the statute is a notice within the prescribed period that the contract will not be renewed.

4. This procedure was established by the laws of Arkansas and the Federal Courts are not empowered to legislate a different one.

5. It is alleged and admitted that the defendant sent and plaintiff received the letter dated May 26, 1970 plainly stating that Mr. Mitchell would not be re-employed and stating the reason to be "persistent failure to follow policy as to discipline."

6. The evidence conclusively shows that Mr. Mitchell appeared personally before the school board and was questioned by the board members. All discussion related to matters of discipline. No board member mentioned anything else and when Mr. Mitchell was invited to answer questions and was afforded opportunity to make statements, no reference was made to anything except the problem of classroom discipline as it concerned Mr. Mitchell and the Alma school.

7. Mr. Mitchell claims that the problem of discipline was not the cause of the failure to re-employ, but that his activity in Teacher's organizations was the cause and an unconstitutional cause.

## CONCLUSION

1. Before this Court could consider the question of the constitutionality or unconstitutionality of failure to re-employ because of activity in Teacher organizations, the evidence would have to show that the action of the board was based on Mr. Mitchell's activity concerning Teacher's organizations. The burden of proving such is the burden of the plaintiff, Mr. Mitchell.

2. The Court finds that the plaintiff has failed to meet the standard required to sustain the burden of proof.

3. If the burden of proof had been on the school board, the Court finds that the evidence clearly shows that the school board acted within its power as such to find that Mr. Mitchell did not comply with the announced school policy as to discipline.

Many of the announcements in the case of Corbin v. Special School District of Fort Smith, Ark., 465 S.W.2d 342 (April 5, 1971) are appropriate to the facts in this case. There, Mrs. Corbin, wife of the Superintendent, was not re-employed because the board adopted a policy not to employ the wife of the Superintendent. Honorable J. Fred Jones, Justice for a unanimous Court said:

"As to appellant's second point, we do not share the appellant's interpretation

of the effect the regulation adopted by the board had on Mrs. Corbin's qualifications for teaching. All the resolution amounted to, as we interpret it, was an agreement between the members of the board, and announcement in the form of the resolution, that the board would not employ the spouse of a superintendent, assistant superintendent or the director of finance and business affairs. This resolution had nothing whatever to do with Mrs. Corbin's qualifications to teach; it had no more effect on Mrs. Corbin's qualifications to teach than it did on Mr. Corbin's qualifications to serve as a school superintendent. By the board's compliance with its resolution, the only effect it had on the Corbins was to prevent both of them being employed in the Fort Smith Special School District at the same time, with one of them being employed as superintendent, with the attending superintending control over the other.

"The appellant argues that the legislature has delegated no such broad powers to boards of directors of school districts that would enable such boards to set standards of qualification of teachers inconsistent with that fixed by the legislature. We agree with the appellant in this argument, but that is not the case before us. As already stated, the resolution complained of did not go to the qualifications of the teacher at all—it went to the district board's discretion in the employment of teachers and other necessary employees as authorized in § 80–509(d) (Supp.1969), and in doing all things necessary and lawful for the conduct of an efficient free public school or schools in the district as authorized by subsection (m) of the same section.

"In Pugsley v. Sellmeyer, 158 Ark. 247, 250 S.W. 538, the board of directors of a school district had adopted, and required the enforcement of, a set of rules, one of which forbade the use of paint or cosmetics by female students. An 18 year old female student appeared in school wearing 'talcum powder' on her face and she was denied admittance until she complied with the rules. While the rules were suspended by the board during the pendency of the appeal, in upholding the authority of the board in making such rules, this court at page 252 of the Arkansas Report said:

'The question therefore is not whether we approve this rule as one we would have made as directors of the district, nor are we required to find whether it was essential to the maintenance of discipline. On the contrary, we must uphold the rule unless we find that the directors have clearly abused their discretion, and that the rule is not one reasonably calculated to effect the purpose intended, that is, of promoting discipline in the school, and we do not so find.'

"We see no reason why the same reasoning should not apply in the case at bar. We are of the opinion, and so hold, that the board had the authority to adopt and enforce the resolution as incidental to its unquestioned and specifically delegated authority to hire teachers and 'do all things necessary and lawful for the conduct of an efficient free public school * * * in the district.'"

In Safferstone v. Tucker, 235 Ark. 70, 357 S.W.2d 3, this court said:

"The law involved appears to be well settled. In this State a broad discretion is vested in the board of directors of each school district in the matter of directing the operation of the schools and a chancery court has no power to interfere with such boards in the exercise of that discretion unless there is a clear abuse of it and the burden is upon those charging such an abuse to prove it by clear and convincing evidence."

And in White v. Jenkins, 213 Ark. 119, 209 S.W.2d 457, we said:

"It is well settled that courts may not intervene to control matters in the discretion of administrative bodies such as school boards, in the absence of a showing of an abuse of such discretion. Necessarily, some latitude in the exercise of this discretion must be given to these boards. They represent the peo-

ple of the locality affected and naturally are closer to the problem to be solved than any court or other agency could be."

"The board having the authority to exercise its discretion, the question then, is whether the action taken by the board in the case at bar was arbitrary, unreasonable, capricious, wrongful, discriminating or oppressive. We cannot say from the record before us that it was. The board of directors was elected by the people of the district and was charged with the responsibility of hiring superintendents, teachers and other necessary employees, and in doing all things necessary and lawful for the conduct of an efficient free public school in the district.

"What effect the employment of the spouse of a superintendent who would work under his supervision would have on the morale and efficiency of other teachers, and the efficient conduct of a free public school the board was required to maintain, we do not know; nor are we required to ascertain. We find no evidence in the record that the board abused its discretion, and we hold that the trial court was correct in refusing to interfere with the exercise of the discretion of the board in matters confided to its judgment.

"As to appellant's third point, the language of the statute as well as that of the contract is plain. Ark.Stat.Ann. § 80–1304(b) (Supp.1969) provides as follows:

'Every teacher in the State shall be employed by written contract. In districts which include cities of 10,000 or more population, according to the last Federal census, school boards may elect the superintendent for a period not to exceed 3 years. In other school districts employing a superintendent, school board may elect the superintendent for a period of not to exceed 2 years. All other teachers and personnel of school districts shall be employed by written contract annually.'

\*  \*  \*  \*  \*  \*

'Every contract of employment hereafter made between a teacher and a board of school directors shall be renewed in writing on the same terms and for the same salary, unless increased or decreased by law, for the school year next succeeding the date of termination fixed therein, which renewal may be made by indorsement on the existing contract instrument; unless during the period of such contract or within ten (10) days after the termination of said school term, the teacher shall be notified by the school board in writing delivered in person or mailed to him or her at last and usual known address by registered mail that such contract will not be renewed for such succeeding year, or unless the teacher during the period of the contract or within ten (10) days after close of school shall deliver or mail by registered mail to such board his or her written resignation as such teacher, or unless such contract is superseded by another contract between the parties. Provided that no contract for the succeeding school year shall be entered into between the school board and any person prior to the beginning of the second semester of the current school year. If a teacher quits or refuses to teach in accordance with his or her contract without just cause, he or she is hereby prohibited from teaching elsewhere during the time for which he or she had been employed. Provided, that nothing herein shall prohibit any school board from entering into a two [2] year or three [3] year contract as authorized in the first paragraph of this subsection.'

"The contract between Mrs. Corbin and the district provides as follows:

"Time: The time period covered by this contract is: 9 Months of school; 182 Days of school; 9 Calendar months; From August 25, 1969, to May 29, 1970.

\*  \*  \*  \*  \*  \*

"Termination: By either party pursuant to the continuing contract law (80–1304)."

"Mrs. Corbin's contract expired by its terms on May 29 1970. It could have been automatically renewed by endorsement for an additional term, had not Mrs. Corbin or the district given notice to the other during the term of the contract, or within 10 days after its termination, that the contract would not be renewed for the ensuing year. The board of directors of the district did notify Mrs. Corbin on June 1, 1970, (within 10 days after the termination of her contract) that the contract would not be renewed.

"We are of the opinion that Mrs. Corbin's rights in this case are governed by her contract and the statutory law relating thereto, and not on 'an expectancy of continued employment' by the Fort Smith Special School District while her husband is superintendent of schools in that district."

In this case, only the matter of Mr. Mitchell's failure to follow the policy of the school has ever been under consideration by the Alma School Board.

The determination by the Board after having Mr. Mitchell personally before it was and is a matter within the discretion of the school board.

There is not a sufficient factual showing to justify a conclusion that the School Board even so much as inquired into the matter of Mr. Mitchell's participation in the organization of Schoolroom Teachers Associations and the evidence is overwhelming to the effect that the board based its decision on the discipline issue.

This is not a matter of whether or not some one else would have reached the same conclusion upon the same set of circumstances.

This Court finds no abuse of discretion by the Board in its determination not to renew Mr. Mitchell's teacher contract.

Perhaps it is wise for the Court to point out that Mr. Mitchell is a white man and there is no question of race or color in this case.

Plaintiff's petition is dismissed; no costs are awarded.